# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

**Civil No. 13-3468 (JRT/JJK)**

RESIDENTIAL FUNDING COMPANY, LLC,

                              Plaintiff,

v.

COMMUNITY WEST BANK, N.A.,

                              Defendant.

---

**Civil No. 13-3498 (JRT/JSM)**

RESIDENTIAL FUNDING COMPANY, LLC and RESCAP LIQUIDATING TRUST,

                              Plaintiffs,

v.

PNC BANK, N.A., *as successor in interest to National City Mortgage Co., NCMC Newco, Inc. and North Central Financial Corporation*,

                              Defendant.

---

**Civil No. 13-3520 (JRT/JSM)**

RESIDENTIAL FUNDING COMPANY, LLC,

                              Plaintiff,

v.

HOMESTEAD FUNDING CORP.,

                              Defendant.

---

**Civil No. 13-3526 (JRT/JJK)**

RESIDENTIAL FUNDING COMPANY, LLC,

                              Plaintiff,

v.

STANDARD PACIFIC MORTGAGE, INC.,

                              Defendant.

---

**MEMORANDUM OPINON AND ORDER ON MOTIONS TO DISMISS**

David Elsberg, **QUINN EMANUEL URQUHART & SULLVIAN LLP**, 51 Madison Avenue, 22nd Floor, New York, NY 10010; and Donald G. Heeman, **FELHABER LARSON**, 220 South Sixth Street, Suite 2200, Minneapolis, MN 55402, for plaintiff.

Jeffrey R. Ansel and Michael A. Rosow, **WINTHROP & WEINSTINE, PA**, 225 South Sixth Street, Suite 3500, Minneapolis, MN 55402, for defendant Community West Bank, N.A.

Richard E. Gottlieb, **BUCKLEYSANDLER LLP**, 123 North Wacker Drive, Suite 1450, Chicago, IL 60606; and David A. Schooler, **BRIGGS AND MORGAN, PA**, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for defendant PNC Bank, N.A.

Arthur G. Boylan, **STINSON LEONARD STREET LLP**, 150 South Fifth Street, Suite 2300, Minneapolis, MN 55402, for defendant Homestead Funding Corp.

Philip R. Stein, **BILZIN SUMBERG BAENA PRICE & AXELROD LLP**, 1450 Brickell Avenue, Suite 2300, Miami, FL 33131; and Janine Wetzel Kimble, **GREENE ESPEL PLLP**, 222 South Ninth Street, Suite 2200, Minneapolis, MN 55402, for defendant Standard Pacific Mortgage, Inc.

Plaintiff Residential Funding Company, LLC ("RFC") is an entity that purchased mortgage loans from various banks and securitized them in batches to sell to investors. After the subprime mortgage crisis in 2007 and 2008, RFC was sued by investors who had purchased its residential mortgage-backed security ("RMBS") investments. RFC went into bankruptcy as a result, and has ultimately reached a global settlement for over $10 billion. RFC now brings these actions – four at issue here, but many more in this district and across the country[1] – against the banks from which it originally purchased the

---

[1] *See, e.g.*, *Residential Funding Co., LLC v. Broadview Mortgage Corp.*, Civ. No. 13-3463, 2014 WL 4104819 (D. Minn. Aug. 19, 2014); *Residential Funding Co., LLC v. Stearns Lending, Inc.*, Civ. No. 13-3516, 2014 WL 4186486 (D. Minn. Aug. 22, 2014); *Residential*

(Footnote continued on next page.)

mortgages involved in its global settlement.  Before the Court are RFC's lawsuits against four banks: Defendants Community West Bank, N.A. ("Community West"), PNC Bank, N.A. ("PNC"), Homestead Funding Corp. ("Homestead"), and Standard Pacific Mortgage, Inc. ("Standard Pacific") (collectively, "Defendants").[2]  RFC brings two claims against each Defendant: one count for breach of contract on the basis that Defendants breached various representations and warranties about the quality of the mortgages they sold to RFC when they knew those representations and warranties to be false, and one count for indemnification for the portions of the $10 billion settlement that RFC claims are attributable to each Defendant.

Each Defendant moves to dismiss.  Defendants' arguments for dismissal generally fall into three categories.  First, Defendants argue that RFC's claims are barred by the statute of limitations because most of the mortgage sale agreements were executed more than six years before RFC initiated these suits in December 2013.  Second, Defendants argue that RFC lacks standing to assert rights under the mortgage sale agreements

_____

(Footnote continued.)

*Funding Co., LLC v. Americash*, Civ. No. 13-3460, 2014 WL 3577312 (D. Minn. July 21, 2014); *Residential Funding Co., LLC v. Mortgage Access Corp.*, Civ. No. 13-3499, 2014 WL 3577403 (D. Minn. July 21, 2014); *Residential Funding Co., LLC v. Embrace Home Loans, Inc.*, Civ. No. 13-3457, 2014 WL 2766114 (D. Minn. June 18, 2014).

[2] The Court addresses Defendants' motions to dismiss in their respective cases in this consolidated memorandum opinion and order because the motions raise similar legal issues.  The order will distinguish between the cases by noting docket items in *RFC v. Community West Bank, N.A.*, Civ. No. 13-3468, as "Community West Docket;" docket items in *RFC v. PNC Bank, N.A.*, Civ. No. 13-3498, as "PNC Docket;" docket items in *RFC v. Homestead Funding Corp.*, Civ. No. 13-3520, as "Homestead Docket;" and docket items in *RFC v. Standard Pacific Mortgage, Inc.*, Civ. No. 13-3526, as "Standard Pacific Docket."

because it assigned the relevant rights to third-party investors upon reselling the mortgages.  Finally, Defendants argue that RFC fails to state a claim because it has failed to specifically identify which warranties and representations Defendants made falsely, how the loans were defective, and how any of the warranties' and representations' alleged falsities caused damage to RFC.

The Court concludes that the statute of limitations was tolled when RFC entered bankruptcy proceedings on May 14, 2012, so RFC's claims for mortgages it purchased before May 14, 2006 are barred by the statute of limitations, but claims for those purchased after May 14, 2006 are not.  With regard to standing, the Court declines to consider the documents forming the basis of Defendants' arguments at this pleading stage, but concludes in the alternative that they would likely present a fact issue inappropriate for dismissal at this stage in the proceedings.  Finally, the Court concludes that RFC has adequately alleged claims for breach of contract and indemnification.  The Court will therefore deny each Defendant's motion to dismiss.

## BACKGROUND

## I.   RFC'S BUSINESS

RFC is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota.  (Community West Docket, Am. Compl. ("Community West Compl.") ¶ 13, April 7, 2014, Docket No. 33.)[3]  Prior to its bankruptcy in May 2012,

---

[3] The amended complaints in each case are substantially similar, with the exception of examples specific to each defendant, which do not affect the numbering of the paragraphs across

(Footnote continued on next page.)

Plaintiff RFC was in the business of acquiring and securitizing residential mortgage loans. (*Id.* ¶ 2.) RFC's business model was built on acquiring loans from correspondent lenders, such as the Defendants, and distributing those loans in two ways: by pooling those loans together with similar mortgage loans to sell into residential mortgage-backed securitization ("RMBS") trusts, or by selling them to whole loan purchasers. (*Id.* ¶ 3.)

RFC purchased loans from each of the Defendants here. From Defendant Community West, RFC purchased more than 75 mortgage loans with an original total principal balance of more than $25 million dollars. (*Id.* ¶ 4.) From Defendant PNC, RFC purchased more than 37,500 mortgage loans, with an original total principal balance of more than $7.6 billion to RFC. (PNC Docket, Am. Compl. ("PNC Compl.") ¶ 4, Mar. 28, 2014, Docket No. 41.) From Defendant Homestead, RFC purchased more than 500 mortgage loans, with an original total principal balance of more than $66 million. (Homestead Docket, Am. Compl. ("Homestead Compl.") ¶ 4, Apr. 25, 2014, Docket No. 28.) From Defendant Standard Pacific, RFC purchased more than 1,000 mortgage loans, with an original total principal balance of more than $350 million. (Standard Pacific Docket, Am. Compl. ("Standard Pacific Compl.") ¶ 4, Apr. 4, 2014, Docket No. 35.)

---
(Footnote continued.)

each complaint. For general background not specific to each Defendant, this Order will cite to the operative complaint against Defendant Community West for the sake of simplicity.

A.     **Loan Purchases From Defendants**

RFC alleges that it entered into contractual agreements with its correspondent lenders, including each of the Defendants, which required the lender to abide by loan-level contractual representations and warranties. (Community West Compl. ¶ 5). These representations and warranties are set forth in the RFC Client Guides, (the "Client Guide"), which is a document created by RFC that is part of its contracts with lenders and incorporated by reference into those contracts. (*See, e.g.*, PNC Docket, Am. Compl., Ex. A at 16 (incorporating GMAC-RFC Client Guide into loan sale contract).) RFC alleges that the Client Guide and contract "collectively form the parties' Agreement, and set the standards to which [Defendants'] loans sold to RFC were expected to adhere." (*Id.* ¶ 18.) RFC has attached excerpts of the Client Guide to each amended complaint, alleging that "[t]he complete versions of the Client Guide are known to the parties and too voluminous to attach in their entirety," but that "the omitted portions of the Client Guides do not affect the obligations set forth in this Amended Complaint." (*Id.*) RFC lists examples of the warranties and representations assured to it in the Client Guide, which include, for example, representations that

> [n]o Loan is a . . . loan considered a 'high-cost,' covered, 'high-risk,' 'predatory' or any other similar designation under any State or local law in effect at the time of the closing of the loan if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees[,]

(*id.* ¶ 24(h)), and that "[t]he Loan is of investment quality, has been prudently originated and has been underwritten in compliance with all requirements of this Client Guide," (*id.* ¶ 24(j)). It appears that there are several versions of the Client Guide and that various

versions applied at different points in time, such that different versions apply to different loans sold to RFC by Defendants.  RFC alleges that the representations and warranties in the Client Guide were "material terms" in its agreements with the banks, because if they "turned out to be false, RFC could have exposure to . . . third parties (to which it sold loans)."  (*Id.* ¶ 25.)

RFC alleges that, as correspondent lenders, Defendants had the initial responsibility for collecting information from the borrower, verifying its accuracy, and underwriting the loans.  RFC alleges that it was understood between the parties that RFC would generally *not* be re-underwriting the loans.  (*Id.* ¶ 20.)  The representations and warranties were important to RFC's business because RFC took the loans it purchased from Defendants and sold them again, making its own representations and warranties.  If any of Defendants' representations and warranties turned out to be false, this could expose RFC to the third parties.  (*Id.* ¶ 25.)  Pursuant to the Client Guide, Defendants' failure to comply with its representations and warranties or any other requirements, terms, or conditions of the Client Guide constituted an "Event of Default," as did Defendants' failure to provide RFC with true, accurate, and complete information in a timely manner.  (*Id.* ¶ 26.)

RFC alleges that under its Agreements with Defendants, the Defendants expressly agreed that RFC was permitted to exercise any remedy allowed by law or in equity in connection with such Events of Default.  (*Id.* ¶ 28.)  Furthermore, RFC alleges that the Client Guide specifies the remedies available to RFC in case of an Event of Default.  (*Id.* ¶ 29.)  These remedies included, but were not expressly limited to, repurchase of the

defective loan, substitution of another loan for the defective one, or indemnification against liabilities resulting from such breaches. (*Id.*) The repurchase provisions required Defendants to compensate RFC for defective loans according to a formula specified in the Client Guide that is based on the original principal balance of the loans. (*Id.* ¶ 31.) RFC also alleges that Defendants were obligated to repurchase loans and/or pay RFC the repurchase price even if the loans had already been foreclosed upon. (*Id.* ¶ 32.)

RFC also alleges that the Client Guide includes "broad indemnification provisions," stating that Defendants shall indemnify RFC

> from all losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, judgments, and any other costs, fees and expenses . . . includ[ing], without limitation, liabilities arising from (i) any act or failure to act, (ii) any breach of warranty, obligation, or representation contained in the Client Guide, (iii) any claim, demand, defense or assertion against or involving [RFC] based on or resulting from such breach, (iv) any breach of any representation, warranty or obligation made by [RFC] in reliance upon any warranty, obligation or representation made by [Defendant] contained by the Client Contract . . . .

(*Id.* ¶ 33.)

### B.     Sale to Third Parties

RFC explains in the complaints that it sold the loans it acquired from the Defendants, either into RMBS trusts, which issued certificates to outside investors, or in whole loan portfolios to other mortgage companies and banks. (*Id.* ¶ 36.) When it sold the loans, it "passed on a more limited set of representations and warranties to the Trusts," and "in making those representations and warranties, RFC relied on information

provided to it by" Defendants, and that "that information in many cases violated [Defendants]' representations and warranties to RFC." (*Id.* ¶¶ 36-37.)

### C.     Problems with Loans

RFC alleges that Defendants breached their "extensive contractual representations and warranties by delivering loans that were not originated or underwritten in accordance with the requirements of the Agreement," and "did not meet the representations and warranties made as to those loans." (*Id.* ¶ 38.)  Specifically, RFC alleges that "[o]ver time, many of the loans sold" to it by Defendants "defaulted or became seriously delinquent" at rates that far exceeded "what would normally be expected in a given population of mortgage loans." (*Id.* ¶¶ 39-40.)  It alleges that internal reviews it conducted determined that many of the loans sold to it by the banks "violated the Client Guide and/or other representations or warranties made by [Defendants], resulting in an Event of Default under the Agreement." (*Id.* ¶ 41 (alleging that "hundreds" of loans sold by Community West violated the Client Guide"); *see also* PNC Docket, Am. Compl. ¶ 41 (alleging that upon internal reviews of loans sold by PNC, "[m]ore than 50% of the loans reviewed were deemed to have a defect"); Homestead Docket, Am. Compl. ¶¶ 39-40 ("[m]ore than ten percent of the loans [Homestead] sold RFC and RFC securitized eventually sustained losses," and the "delinquency and default rates far exceed what would normally be expected in a given population of mortgage loans"); Standard Pacific Docket, Am. Compl. ¶ 41 ("Internal reviews conducted by RFC determined that dozens of the loans sold to RFC by Standard Pacific violated the Client Guide . . . .").)  It alleges

that "[t]ypes of defects varied, but included income misrepresentation, employment misrepresentation, insufficient credit scores, appraisal misrepresentations or inaccuracies, undisclosed debt, and missing or inaccurate documents." (Community West Compl. ¶ 42.) It further alleges that "a number of the loans defaulted very shortly after origination (constituting Early Payment Defaults or EPDs), which is widely recognized in the industry as often signaling fraud or other problems in the origination and underwriting of the loans." (*Id.*)

In each complaint, RFC then lists examples of loans with "significant and material defects violating the Client Guide representations and warranties." (*See, e.g.*, *id.* ¶ 43.) For example, the Community West complaint lists the following example:

> Loan ID # 3141050 – The borrower on this loan left both of his jobs prior to the funding date, which was not disclosed at the time of funding. In addition, the borrower took out a loan during the gap period with a monthly payment of $180. Not long after the loan funded, the borrower filed for chapter 13 bankruptcy protection. The failure to disclose the borrower's lack of employment and the additional debt made it materially riskier than represented by Community West which rendered the loan unacceptable to RFC.

(*Id.* ¶ 43(a).) The Community West complaint contains nine examples of defective loans.

(*See id.*) An example listed in RFC's complaint against Standard Pacific states:

> Loan ID #10900725 – This loan's combined loan-to-value ratio, as well as the borrower's debt-to-income ratio, materially exceeded program guidelines and did not qualify the borrower for the terms of the loan. Review by RFC's internal quality audit personnel also revealed the borrower had inadequate reserves and adverse credit. The loan therefore contained material breaches of Standard Pacific's representations and warranties, including a number of those identified in paragraphs 24 and 27 above, rendering the loan unacceptable to RFC.

(Standard Pacific Compl. ¶ 43(a).)   The Standard Pacific complaint includes four examples of defective loans.  (*See id.*)  The other complaints similarly include specific examples: the PNC complaint includes five examples and the Homestead complaint includes two examples.  (*See* PNC Compl. ¶ 43; Homestead Compl. ¶ 43.)  RFC does not intend for such examples "to be an exhaustive list of the loans . . . that contained material breaches of representations and warranties;" instead, "these loans represent a sampling of the material defects found in the loans . . . sold to RFC."  (*Id.* ¶ 44.)  RFC acknowledges that, prior to the commencement of these lawsuits, the Defendants conceded that certain of their loans sold to RFC were materially defective and had already paid sums to RFC to cover those defects.  RFC is not seeking to recover again on those sums.  (*Id.* ¶ 34.)

## II.      BANKRUPTCY AND THIS ACTION

RFC alleges that due to the failure of Defendants and other correspondent lenders to honor their contractual representations and warranties, RFC was sued by numerous counterparties and investors in its RMBS securities, based on allegations that the loans were defective and rife with fraud and compliance problems.  (*Id.* ¶¶ 46-50.)  By May 2012, RFC was facing over two dozen lawsuits, all alleging that the loans RFC has securitized were defective, as well as claims by investors in hundreds of its RMBS securities seeking tens of billions of dollars based on loan-level problems.  (*Id.* ¶ 8.)  RFC's complaints detail several of the lawsuits that are specific to the loans sold to RFC by each Defendant.  (*See, e.g.*, *id.* ¶¶ 51-55; PNC Compl. ¶¶ 54-57; Homestead Compl. ¶¶ 58-63; Standard Pacific Compl. ¶¶58-65.)  All of the lawsuits alleged that "the loans

RFC sold into RMBS securitizations were defective in a variety of ways, including because of borrower fraud, missing or inaccurate documentation, fraudulent or inflated appraisals, misrepresentations concerning owner-occupancy, or failure to comply with applicable state and federal law." (Community West Compl. ¶ 57.) RFC alleges that, "[a]cross the dozens of securitizations involved in these lawsuits," each of the Defendants were responsible for a given number of the loans involved: Community West was responsible for over 35 loans, PNC was responsible for over 11,000 loans, Homestead was responsible for over 500 loans, and Standard Pacific was responsible for over 1,000 loans. (*Id.* ¶ 59; PNC Compl. ¶ 62; Homestead Compl. ¶ 67; Standard Pacific Compl. ¶ 69.)

As a result of the exposure from the lawsuits, RFC filed for Chapter 11 bankruptcy protection in the Southern District of New York on May 14, 2012. (*Id.* ¶¶ 49, 61.) In each complaint, RFC provides specific examples of proofs of claim filed on the basis of defective loans, alleging that trustees and investors in RFC-sponsored securitizations asserted loan-level defects totaling in the millions of dollars. (*Id.* ¶ 62; PNC Compl. ¶ 65; Homestead Compl. ¶ 70; Standard Pacific Compl. ¶ 72.) RFC resolved its RMBS-related liabilities through bankruptcy in global settlement for over $10 billion of allowed claims in its bankruptcy case. (*Id.* ¶¶ 10, 65-66.) Pursuant to the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et. al and the Official Committee of Unsecured Creditors*, which took effect on December 17, 2013, ResCap Liquidating Trust succeeded to all of RFC's rights and interests under RFC's agreements with each of the defendants, and now controls RFC. (*Id.* ¶¶ 13, 66.)

RFC initiated these actions against Defendants on December 13, 2013. (Community West Docket, Compl., Dec. 13, 2013, Docket No. 1; PNC Docket, Compl., Dec. 13, 2013, Docket No. 1; Homestead Docket, Compl., Dec. 13, 2013, Docket No. 1; Standard Pacific Docket, Compl., Dec. 13, 2013, Docket No. 1.)  It has since amended its complaint in all four actions.   The amended complaints include two counts: one for breach of contract and one for indemnification.  With its breach of contract claim, RFC alleges that it entered into an Agreement with each Defendant under which RFC acquired mortgage loans, and that pursuant to those Agreements, the banks "made representations and warranties to RFC regarding the quality and characteristics of the mortgage loans sold," but that Defendants "materially breached [their] representations and warranties to RFC inasmuch as the mortgage loans did not comply with the representations and warranties."  (Community West Compl. ¶¶ 69-71.)   RFC alleges that these material breaches constituted Events of Default under the Agreements and that RFC has been injured and suffered financial loss as a result.  (*Id.* ¶¶ 73-74.)

With its indemnification claim, RFC alleges that it has incurred liabilities, losses, and damages on account of the defects in the loans sold to RFC and that Defendants "expressly agreed to indemnify RFC for the liabilities, losses, and damages" which RFC has incurred.  (*Id.* ¶ 78.)  It alleges that pursuant to its express contractual obligations, Defendants are obligated to compensate RFC for the portion of the global settlement associated with its breaches of representations and warranties, as well as for the portion of RFC's other liabilities and losses, including RFC's attorneys' fees to defend against,

negotiate, and settle claims relating to allegedly defective loans associated with those breaches.  (*Id.* ¶ 67.)

All Defendants now move to dismiss RFC's claims.[4]   The three primary arguments presented by Defendants in favor of dismissal are that (1) RFC's claims are time-barred because Defendants sold the loans to RFC over six years before this action was initiated in 2013, (2) RFC does not have any rights under any agreements with Defendants to assert because it assigned them all to the third-party purchasers of the loans, and (3) RFC's allegations are inadequate and fail to state a claim.[5]

## ANALYSIS

## I.   STANDARD OF REVIEW

In reviewing a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "'claim to relief that is plausible on its face.'"  *Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 660 (8th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).   To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"

---

[4] RFC initially filed motions to transfer these actions to bankruptcy court in S.D.N.Y. but has since withdrawn those motions.  (Community West Docket, Letter, June 4, 2014, Docket No. 47; PNC Docket, Letter, June 4, 2014, Docket No. 60; Homestead Docket, Letter, June 4, 2014, Docket No. 35; Standard Pacific Docket, Letter, June 4, 2014, Docket No. 63.)

[5] Although Defendants each raise slightly different variations on each of these main arguments, the Court addresses all of Defendants' arguments collectively and does not distinguish between which Defendants made which version of an argument.

*Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility," and therefore must be dismissed. *Id.* (internal quotation marks omitted). Finally, Rule 12(b)(6) "authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

## II.     STATUTE OF LIMITATIONS

Defendants argue that RFC's claims are barred by the six-year statute of limitations applicable to breach of contract and indemnification claims.

### A.     Breach of Contract

Under Minnesota law, breach of contract claims have a statute of limitations of a period of six years, running from the time of breach. *See* Minn. Stat. § 541.05, subd. 1(1); *Pederson v. Am. Lutheran Church*, 404 N.W.2d 887, 889 (Minn. Ct. App. 1987). Defendants generally argue that RFC's breach of contract claims are untimely because RFC alleges that the Agreements included representations and warranties for the loans that Defendants knew to be false at the time of the sale, such that the statute of limitations began to run when Defendants sold the loans to RFC. They assert that most of the loan sales occurred more than six years before RFC initiated these suits on December 13, 2013. RFC counters that the statute of limitations was tolled for two years

when it filed for bankruptcy on May 14, 2012, so, at a minimum, loans sold after May 14, 2006 are within the statute of limitations. It does not concede that loans sold before that date are untimely, but rather argues that they may be timely depending on the facts and circumstances of the case, which is not properly resolved at the pleading stage.

### 1.    Bankruptcy Tolling

Under 11 U.S.C. § 108(a), if a limitations period "has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of" the expiration of the limitations period or two years after the final approval of the reorganization or liquidation plan. 11 U.S.C. § 108(a)(1)-(2). Although RFC is not the trustee here, it argues that it is entitled to this tolling because it is the debtor-in-possession with respect to the bankruptcy proceeding and 11 U.S.C. § 1107(a) affords a debtor-in-possession the same rights as a trustee with respect to § 108(a). *See* 11 U.S.C. § 1107(a) ("[A] debtor in possession shall have all the rights, other than the right to compensation under section 330(a) of this title . . . of a trustee serving in a case under this chapter."); *see also Johnson v. First Nat. Bank of Montevideo, Minn.*, 719 F.2d 270, 278 n.11 (8th Cir. 1983) ("Although the language of § 108 refers only to the trustee, it is generally agreed that the debtor-in-possession is also entitled to the statute's privileges.").

RFC was the debtor-in-possession when it filed for bankruptcy on May 14, 2012 and therefore § 108(a) tolled the statute of limitations on RFC's claims such that, when it filed these actions on December 13, 2013, any claims arising on or after May 14, 2006 were timely. Defendants make two arguments against this conclusion, neither of which is

persuasive. First, Defendants point to the Eighth Circuit's unpublished opinion in *Comcast of Illinois X v. Multi-Vision Elecs., Inc.*, 369 F. App'x 761, 763 (8th Cir. 2010), in which it held that the district court did not abuse its discretion in concluding that a debtor's claims were untimely despite § 108(a), because the debtor was not a trustee, and was therefore not entitled to tolling. The court there did not cite 11 U.S.C. § 1107(a), nor did it explain whether or why its conclusion might extend to a chapter 11 bankruptcy, like RFC's here, rather than a chapter 7 bankruptcy. In light of the statute and Eighth Circuit precedent, *see Johnson*, 719 F.2d at 278 n.11, *Comcast* does not deprive RFC of bankruptcy tolling here.

Second, Defendants argue that when the global settlement plan was approved on December 11, 2013, (*see* Community West Compl. ¶ 10), RFC no longer existed as an entity and was replaced by a liquidating trust, such that RFC could not benefit from tolling when it filed these actions on December 13, 2013. But the plan did not become effective until December 17, 2013, (*id.* ¶ 66), and the Court treats the plan's effective date as the relevant date for determining whether RFC remained in existence as the debtor-in-possession. Even if RFC could be considered to have dissolved into the liquidating trust before the filing of this action, some courts have held that liquidating trusts in this situation are entitled to § 108(a) tolling as a representative of the estate. *Antioch Litig. Trust v. McDermott Will & Emery LLP*, 500 B.R. 755, 763 (S.D. Ohio 2013) (permitting trust, as representative of the estate, to toll claims under § 108(a), observing that "[o]ther courts have concluded that estate representatives, other than a trustee or a debtor-in-possession, can invoke the tolling provisions of Section 108," and

that "[t]he Trust is acting on behalf of a debtor-in-possession, as a representative of its estate, and is pursuing claims that belonged to the debtor for the benefit of the debtor's creditors").  The Court therefore concludes that the tolling provision in § 108(a) renders timely RFC's claims for loans sold on or after May 14, 2006.

### 2.      Loans Sold Before May 14, 2006

RFC does not concede that loans sold before May 14, 2006 are time barred, and instead argues that it would be premature to dismiss claims based on those loans because, depending on the facts of each loan, its claims for breaches of the warranties and representations may be timely.  In support, it cites to cases that indicate that where contracts involving continuing performance over time or where "future event[s] . . . will determine whether" a contract is breached, "the statute does not begin to run until the happening of such future event."  *City of Pipestone v. Wolverine Ins. Co.*, Civ. No. 4-84-634, 1985 WL 1845, at *4 (D. Minn. June 28, 1985); *see also Moore v. Medtronic, Inc.*, Civ. No. 99-2066, 2001 WL 1636248, at *2 (D. Minn. July 30, 2001) ("Where a contract provides for continuing performance over a period of time, each breach may begin the running of the statute anew such that accrual occurs continuously." (internal quotations omitted)).

RFC has not demonstrated how any of its allegations suggest that Defendants' alleged breaches could be the type that occurred over time or **after** the initial sale of the loan.  Nor does it explain how Defendants could be liable in the event that the circumstances for a loan changed **after** its initial sale to RFC such that the representations

and warranties became false at a date later than the initial sale. *Cf. Residential Funding Co., LLC v. Mortgage Access Corp.*, Civ. No. 13-3499, 2014 WL 3577403 (D. Minn. July 21, 2014) (observing that the defects RFC alleges were present in the loans – income misrepresentation, employment misrepresentation, owner occupancy misrepresentations, appraisal misrepresentations or inaccuracies, undisclosed debt, and missing or inaccurate documents – "occur at the time a loan is underwritten, not at some later date," and dismissing as untimely RFC's claims for loans sold before May 14, 2006). The Court will therefore grant Defendants' motion to dismiss with respect to RFC's claims for loans it purchased from Defendants prior to May 14, 2006.[6]

## B.    Indemnification

Defendants also argue that RFC's indemnification claims are barred by the statute of limitations. "Under the common law, the right of indemnity does not accrue until the liability of the party seeking indemnity has become finally fixed and ascertained, or until after the claimant has settled or has paid the judgment or more than a commensurate

---

[6] RFC also argues that its claims for loans purchased before May 14, 2006 may proceed because statute of limitations is an affirmative defense, and not appropriate for resolution on a motion under Rule 12(b)(6). *See, e.g.*, *Walker v. Barrett*, 650 F.3d 1198, 1203 (8th Cir. 2011) ("[A]s a general rule, the possible existence of a statute of limitations defense is not ordinarily a ground for Rule 12(b)(6) dismissal." (internal quotations omitted)). But the general rule that statute of limitations is not a ground for dismissal under Rule 12(b)(6) is excepted when the "complaint itself establishes the defense." *Jessie v. Potter*, 516 F.3d 709, 713 (8th Cir. 2008). As explained above, RFC's complaints do not include any allegations giving rise to a plausible inference that its claims are for continuing breaches of representations and warranties or that Defendants breached the contracts after the initial sale. To the extent that RFC argues that the Client Guide provides for remedies for the full life of the loans, that does not establish that RFC may seek remedies for breaches on the basis of representations and warranties **becoming false** after the initial sale, but rather that it is not precluded from seeking remedies for breaches of representations and warranties after the initial sale of the loans.

share of it." *Metro. Prop. & Cas. Ins. Co. v. Metro. Transit Comm'n*, 538 N.W.2d 692, 695 (Minn. 1995) (internal quotations omitted).   Here, RFC's losses were presumably fixed or attained during the bankruptcy proceeding, which began in May 2012.

But Defendants argue that this common law rule does not apply here because RFC's indemnification claims are too intertwined with its contract claims and are therefore governed by the statute of limitations for its contract claims, which is six years from the initial sale of the loan.   They argue that, because RFC has the right to seek repurchase of the loans in the event of a failure of a representation or warranty, the relevant statute of limitations for indemnification should be the same date as it would be for repurchase.   Citing two cases from other districts, they argue that such date would be the sale of the loan.   *See Lehman Bros. Holdings, Inc. v. Evergreen Moneysource Mortg. Co.*, 793 F. Supp. 2d 1189 (W.D. Wash. 2011); *Lehman Bros. Holding Inc. v. Standard Pacific Am. Mortg. Co.*, Civ. No. 13-cv-930, 2014 WL 1715365 (D. Colo. April 30, 2014).   But both cases involved a different factual circumstance than is present here: in both, the plaintiff-loan purchasers made demands for payment upon the defendant-loan sellers, which were refused.   In *Universal American Mortgage*, the court found that plaintiff's breach of contract claim accrued at the time it purchased the mortgage from defendants, not when it repurchased the allegedly defective loan from the third-party purchaser to which it had sold the loan.   2014 WL 1715365, at *3.   The court also rejected plaintiff's alternative argument that the suit was timely because the defendants' failure to repurchase the loan within thirty days of the plaintiff's demand was an independent breach, starting its own statute of limitations.   *Id.* at *4.

In *Evergreen*, the court similarly rejected Plaintiff's argument that the statute of limitations for breach of contract action did not begin to run until after the defendant refused, by letter, to indemnify plaintiff for losses it suffered on a loan purchased from defendant. 793 F. Supp. 2d at 1194. The court reasoned that the defendant's duty to "indemnify for losses incurred as a result of a mortgage loan is only triggered by a breach of any of the representations, warranties, or covenants" and that New York carries a six-year statute of limitations from the date of the first alleged breach of a contract. *Id.* (internal quotations omitted). The court also rejected what it considered to be plaintiff's attempt to "improperly circumvent statutes of limitations by simply recasting their claims [for breach of contract] as ones for indemnity." *Id.* at 1199 n.2. Significantly, the plaintiff in *Evergreen* did not allege that it suffered any liability to a third party. *Id.*

The Court concludes that RFC's claim for indemnification accrued, at the earliest, when it filed for bankruptcy in May 2012. This is not a case where the plaintiff **has** made a demand for indemnification upon a defendant pursuant to a contractual provision, which was refused. In that circumstance, if the plaintiff believed the refusal to be contrary to a contractual provision, it would give rise to a breach of contract claim, not necessarily an indemnification claim. But here, where RFC alleges that it has been ordered to make payments to third parties on account of mistakes for which it alleges Defendants are required to indemnify it, it would not make sense for the statute of limitations to have accrued at the original sale. Such a rule would leave open the possibility that a plaintiff was required to file a lawsuit for indemnification **before** any judgment or order for it to make payment to a third party was final, in order for the

plaintiff to preserve a claim's timeliness.   The rulings in *Evergreen* and *Universal American Mortgage* do not pose such a challenge because there, the adverse judgment or demand for payment had been made upon the plaintiff such that the amount and details of the indemnification demand against the defendant were known.   Without further support from Minnesota case law to ignore its clear rule regarding the application of the statute of limitations for indemnity claims, the Court declines to adopt the restrictive interpretation urged by Defendants.   *Cf. Discovery Grp. LLC v. Chapel Dev., LLC*, 574 F.3d 986, 989 (8th Cir. 2009) (applying Missouri law, and holding that where third-party claims against plaintiff "remained unresolved . . . , the full measure of their losses in defending against [the third-party] claims was not yet sustained or capable of ascertainment, so their cause for indemnity had not yet accrued").   The Court therefore concludes that RFC's claims for indemnification are timely.[7]

## III.   STANDING

Defendants argue that RFC lacks standing to bring these claims against them because RFC assigned its rights in the loans to third-party purchasers.   They point to RFC's agreements with its third-party purchasers, arguing that under the terms of those agreements, RFC assigned to the purchasers any contract rights it had against the banks, and that a "breach-of-contract claim cannot be maintained when the rights vested in the

---

[7] The Court has received and reviewed Defendant Standard Pacific's supplemental filing notifying the Court of the recent disposition in *Lehman Brothers Holdings, Inc. v. Universal American Mortgage Co., LLC*, Civ. No. 13-92 (D. Colo. Aug. 28, 2014).   (*See* Letter to District Judge, Sept. 2, 2014, Docket No. 75.)   The reasoning and ruling in that case does not alter the Court's conclusion regarding the statute of limitations here.

contract have been assigned to another party." *Dunn v. National Beverage Corp.*, 729 N.W.2d 637, 648 (Minn. Ct. App. 2007), *aff'd*, 745 N.W.2d 549 (Minn. 2008).

In making this argument, Defendants point to the securitization agreements that RFC had with its purchasers, which are not part of RFC's pleadings.  For example, PNC points to loans listed as examples in RFC's complaint, which are covered by securitization agreement 2005-KS2 AA, which it includes as an exhibit to its counsel's declaration.  (*See* Decl. of Richard A. Gottlieb, Ex. 8, Apr. 25, 2014, Docket No. 50.)  It points to language in that securitization agreement that states:

> Concurrently with the execution and delivery hereof, RFC hereby assigns to the Company, and the Company hereby assumes, all of RFC's rights and obligations under the Seller Contracts with respect to the Mortgage Loans to be serviced under the Pooling and Servicing Agreement, insofar as such rights and obligations relate to (a) any representations and warranties regarding a Mortgage Loan made by a Seller under any Seller Contract and any remedies available under the Seller Contract for a breach of any such representations and warranties if (i) the substance of such breach also constitutes fraud in the origination of the Mortgage Loan or (ii) the representation and warranty relates to the absence of toxic materials or other environmental hazards that could affect the Mortgaged Property, or (b) the Seller's obligation to deliver to RFC the documents required to be contained in the Mortgage File and any rights and remedies available to RFC under the Seller Contract in respect of such obligation or in the event of a breach of such obligation; **provided that, notwithstanding the assignment and assumption hereunder, RFC shall have the concurrent right to exercise remedies and pursue indemnification upon a breach by a Seller under any Seller Contract of any of its representations and warranties.**

(*Id.* at 10, ¶ 6 (emphasis added).)  PNC does not quote the emphasized portion at the end. Defendants do not exhaust all of the applicable securitization agreements, but argue that these are illustrative of the assignment language applicable to RFC's securitization agreements with purchasers.  Defendants point to this contractual language as

- 23 -

demonstration that RFC assigned away its rights, including the right to bring suit against Defendants, when it sold loans to the third-party purchasers.

The Court finds that, at this pleading stage, RFC has adequately alleged that it has standing to assert its rights in the loan sale Agreements with Defendants.  First, the Court observes that this argument is based upon documents not included in RFC's pleadings.  Although the Court may consider documents "necessarily embraced by the pleadings," *Saterdalen v. Spencer*, 725 F.3d 838, 841 (8th Cir. 2013) (internal citation and quotations omitted), the connection between RFC's pleadings and the securitization agreements upon which Defendants rely is thin.  RFC alleges that it "sold the[] loans to RMBS trusts and whole loan purchasers," and that when it "sold the loans, it passed on a more limited set of representations and warranties to the Trusts, and, as required by SEC regulations, disclosed pertinent information about the loans to investors in the RMBS."  (Community West Compl. ¶¶ 25, 37.)  Defendants have not pointed to any other provisions of RFC's complaints that arguably relate to the securitization agreements.  These allegations do not mention any contract between RFC and the third parties, much less any contractual arrangements under which RFC assigned its rights in the loan agreements.  The Court concludes that the securitization agreements are not necessarily embraced by the pleadings, and therefore does not consider them at this stage in the proceeding.[8]

---

[8] Defendants also argue that these agreements are properly considered at the pleading stage because they are public records filed with the SEC.  The Court nevertheless declines to consider the documents at this stage, because Defendants rely on them to prove the truth of their contents in order to prevail on a fact dispute with RFC over whether RFC has assigned the rights it asserts here to third-party investors.  *See Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015,

(Footnote continued on next page.)

However, even if the Court were to consider the third-party agreements, the Court would conclude that they raise factual issues that are not properly resolved at this pleading stage.   At a minimum, the language from the portion of the agreement referenced by PNC does not unambiguously support Defendants' position.   Although it states that "RFC hereby assigns . . . all of RFC's rights and obligations under the Seller Contracts with respect to the Mortgage Loans," it later includes a disclaimer "that, notwithstanding the assignment and assumption hereunder, RFC shall have the concurrent right to exercise remedies and pursue indemnification upon a breach by a Seller under any Seller Contract of any of its representations and warranties."   (Gottlieb Decl., Ex. 8 at 10, ¶ 6.)   The Court cannot conclude that this language, which PNC points to as an example of the assignments, deprives RFC of standing to assert rights under the Agreements.   *Cf. Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010), *aff'd*, 469 F. App'x 56 (2d Cir. 2012) ("[W]hen the language of a contract is ambiguous, its construction presents a question of fact, which of course precludes summary dismissal on a Rule 12(b)(6) motion." (internal quotations omitted)).   The Court concludes that

---

(Footnote continued.)

1018 (5th Cir. 1996) (adopting rule that public SEC documents may be considered "only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents"); *see also Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995) ("Given that there was considerable argument over the significance of the 10–K form, the judge properly found that its contents were subject to dispute.").   To the extent that Defendants argue that these documents are not intended to **prove** that RFC does not have standing, but rather to illustrate that RFC has failed to adequately allege that it has standing, that is a distinction without a difference.

RFC has plausibly alleged that it has standing to assert its rights in the Agreements against Defendants.

## IV.   ADEQUACY OF THE PLEADINGS

### A.   Breach of Contract

Defendants argue that RFC has failed to allege specific facts that adequately state a claim for breach of contract.  In essence, they argue that, while RFC's complaints allege **generally** that loans it purchased from lending institutions were likely defective and partially responsible for the lawsuits by third-parties for which RFC has now resolved in a $10 billion settlement, RFC's allegations fail to specifically allege that the individual loans it purchased from Defendants caused any of RFC's injuries.   Defendants' arguments focus on the level of detail of the allegations with regard to the defects in the loans in many respects.  First, they argue that RFC fails to identify the loans in a way that allows Defendants to identify the loans because in the attachments to the complaints RFC uses the identifying loan numbers that RFC has assigned to the loans, not the numbers that the Defendants used.  Second, they argue that RFC's allegations fail to identify the contracts that Defendants allegedly breached, because different versions of the Client Guide were in effect at different times, and RFC does not indicate what language from each Client Guide applies to each allegedly defective loan.  Third, they argue that RFC's allegations fail to identify which representations and warranties were violated with regard to loans, or how Defendants had violated them.   Finally, they argue that RFC's allegations fail to identify how Defendants or any of their alleged conduct caused any of

the damages RFC alleges it suffered. Defendants argue that without allegations of these details with regard to each allegedly defective loan, RFC has not provided them with adequate notice of the claims against them and has failed to plausibly allege that Defendants breached any loan sale Agreements in a way that actually caused RFC injury.

RFC argues that its allegations suffice to state claims against Defendants for breach of contract, because it is not necessary to plead with specificity with regard to each individual loan it alleges is defective. Rather, it argues that its pleadings adequately give rise to a plausible inference that Defendants breached their contracts with RFC if it both gives examples of the types of defects in the loans and includes allegations making it plausible that the defects were widespread. It argues that it has adequately pleaded as much because the complaint and exhibits list which loans are at issue (*see, e.g.*, Community West Compl., Ex. C), how the loans are defective and which contract provisions those defects violate, that these defects were widespread, and how they harmed RFC. RFC also argues that case law indicates that loan-level allegations are not required to survive a motion to dismiss. In particular, it points to *Ace Securities Corp. Home Equity Loan Trust, Series 2007-HE3 ex rel. HSBC Bank USA, Nat. Association v. DB Structured Products, Inc.* ("*Ace Securities*"), Civ. No. 13-1869, 2014 WL 1116758 (S.D.N.Y. Mar. 20, 2014), an action brought by trusts which had purchased securitizations against the sponsor of those securitizations – so akin to the third-party investors here bringing an action against RFC. There, the plaintiff alleged that the defendant failed to repurchase loans which would have been eligible for repurchase on account of defects that violated representations and warranties the defendant made to

plaintiffs.  *Id.* at *1-4.  The relevant contract required the plaintiff to send a notice to the defendant whenever it discovered a breach of representations and warranties.  *Id.* at *4. Some of the notices were included in the pleadings, and "provided, for each loan as to which a breach had been identified, the loan number, the specific representations and warranties that had been breached, the specific subsections of the MLPA setting forth those representations and warranties, and a description of the facts establishing the breaches."  *Id.*  The court held that the plaintiff's allegations sufficed to meet the plausibility standard in *Twombly* and *Iqbal*, observing that "a complaint for repurchase need not contain specific allegations regarding each loan at issue," and that "many courts have accepted statistical 'sampling' as a means of demonstrating liability."  *Id.* at *13 & n.9.

Defendants argue that *Ace Securities* does not help RFC here because it is a different kind of case – one by investors against the sponsor of securitizations rather than a case by the sponsor against loan originators – and while sampling may be acceptable in an RMBS securitization case, it is not here, where Defendants sold individual loans rather than securitizations to RFC.  Defendants further argue that, even if the court's holding in *Ace Securities* that loan-level allegations are not necessary applies here, the allegations there were far more detailed than those here, as the notices with specific information about many of the loans at issue were included in the pleadings.  The Court recognizes the distinction between an RMBS case against a securitization sponsor as in *Ace*

*Securities* and RFC's claims against the loan originators, and thus does not find that case to be dispositive of whether loan-level allegations are necessary here.[9]

Instead, examining RFC's allegations in light of the elements of a breach of contract claim under Minnesota law, the Court concludes, drawing on "its judicial experience and common sense," *Iqbal*, 556 U.S. at 679, that RFC's allegations here adequately give rise to a plausible inference that Defendants breached the representations and warranties in its loan sale Agreements with RFC without loan-level allegations. *Residential Funding Co., LLC v. Broadview Mortgage Corp.*, Civ. No. 13-3463, 2014 WL 4104819, at *5 (D. Minn. Aug. 19, 2014) ("RFC will not be required to plead with loan-by-loan specificity in the cases at issue here. Requiring such specificity in cases involving hundreds or thousands of loans contravenes the requirement of pleading a 'short and plain statement' of claims." (quoting Fed. R. Civ. P. 8(a)).

To adequately plead a cause of action for breach of contract under Minnesota law, a plaintiff must show (1) formation of a contract, (2) performance by the plaintiff of any conditions precedent, (3) breach of the contract by defendants, and (4) damages. *General*

---

[9] Plaintiffs also point to *Oklahoma Police Pension & Retirement System v. U.S. Bank National Ass'n*, 291 F.R.D. 47 (S.D.N.Y. 2013), another RMBS case in which investors sued the trustee for fourteen RMBS trusts. *Id.* at 51-52. As in *Ace Securities*, the court denied the defendant's motion to dismiss, observing that plaintiffs "allege[d] that there have been significant losses in the Covered Trusts, that the mortgage files were riddled with document deficiencies, that federal and state investigators have uncovered widespread abuses in such files, and that there were numerous document deficiencies found in the public records of the foreclosures on two of the Covered Trusts," and further finding sufficient plaintiff's allegations that the trusts "performed extremely poorly, that there is documented evidence of irregularities in other, similar trusts, and that the seller repurchased less than 1% of the mortgage loans in the Covered Trusts." *Id.* at 66-67, 69. Like *Ace Securities*, the claims at issue in *Oklahoma Police Pension & Retirement System* are distinct enough from those at issue that the Court does not find the reasoning there to be dispositive with regard to the adequacy of RFC's allegations here.

*Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 703 F.3d 1104, 1107 (8th Cir. 2013).  The parties do not dispute the first two elements.  Looking to whether RFC has adequately alleged that Defendants breached their Agreements with RFC, the Court concludes that RFC has adequately alleged which provisions Defendants breached and how it breached them.  It is sufficient that RFC alleges that Defendants breached the representations and warranties provisions of the Client Guide and listed specific examples of the representations and warranties it breached.  (*See, e.g.*, Community West Compl. ¶ 24.)  To the extent that Defendants argue that this is inadequate because RFC does not allege specifically which representations and warranties were false with respect to each individual loan, as the Court explains below, that level of specificity is not necessary to bring these allegations past "the line between possibility and plausibility of 'entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).[10]

---

[10] Defendants also argue that RFC's breach of contract allegations are inadequate because RFC does not distinguish between the various versions of the Client Guide nor indicate which version of the Client Guide applies to which loan.  RFC attached excerpts of the Client Guide to its complaints (*see, e.g.*, Community West Compl., Ex. B) and alleges that "[t]he complete versions of the Client Guide are known to the parties and too voluminous to attach in their entirety," but that "the omitted portions of the Client Guides do not affect the obligations set forth in this Amended Complaint."  (*Id.* ¶ 18.)  RFC has adequately alleged that the Client Guide provides the relevant representation and warranties terms, and Defendants do not challenge their facial validity.  Rather, counsel for Standard Pacific indicated at oral argument that RFC's excerpting of the Client Guide was problematic for Standard Pacific because it no longer had in its possession the Client Guides it agreed to for the loan sales to RFC.  This is a problem and dispute for discovery and later stages in this proceeding, not the pleading stage, the purposes for which RFC's allegations suffice.

PNC also argues that RFC's allegations about the applicability of the Client Guide is faulty because Commitment Letters, which were also part of the loan sale Agreements and which controlled over the Client Guide in the event of a conflict, state that the loans were governed by the seller's underwriting guidelines, not RFC's.  (*See* PNC Docket, Mem. in Supp. of Mot. to

(Footnote continued on next page.)

RFC has also plausibly alleged how Defendants breached the representations and warranties.  It lists examples of defective loans for each Defendant in each complaint, explaining how those example loans breached representations and warranties.  (*See, e.g.*, Community West Compl. ¶ 43(a); Homestead Docket, Am. Compl. ¶ 43(a).)  Defendants make various arguments as to why these examples are faulty, including, for example, that they have already been repurchased, were sold before May 14, 2006, or are simply too few to support plausible allegations that other loans were similarly defective.  But RFC includes extensive other allegations that support a plausible inference that the types of problems identified in the examples are widespread.  It alleges that the loans it purchased from Defendants had high delinquency and default rates – higher than what would have been expected in a normal population of loans – and that many of the loans defaulted shortly after origination, which "is widely recognized in the industry as often signaling fraud or other problems in the origination and underwriting of the loans."  (Community West Compl. ¶¶ 39-40, 42.)  It also alleges that it undertook its own internal review, which determined that many of the loans sold to RFC by Defendants violated the Client Guide and other representations and warranties.  (*Id.* ¶ 41.)  Furthermore, RFC alleges that with the loans at issue, it sought repurchase of loans from Defendants at higher rates than average.  For example, RFC alleges that it "ordinarily received a limited number of repurchase demands," but that in 2007 it began to receive repurchase demands and

---

(Footnote continued.)

Dismiss at 15, Apr. 25, 2014, Docket No. 49.)  The Court accepts as true RFC's allegation that the Client Guide governed the loan sales at this pleading stage.  PNC's challenge to the accuracy of that allegation must wait for later stages in this proceeding.

repurchased over $340,000 worth of loans from a bank affiliated with PNC. (PNC Docket, Am. Compl. ¶¶ 51-52.) Taken as a whole, these allegations support a plausible inference that defects such as those listed in the example loans in each complaint were widespread. *Cf. Broadview Mortgage*, 2014 WL 4104819, at *6 ("The higher than normal delinquency and default rates of Defendants' loans plausibly demonstrate a failure in underwriting procedures."); *but see Residential Funding Co., LLC v. Embrace Home Loans, Inc.*, Civ. No. 13-3457, 2014 WL 2766114, at *5 (D. Minn. June 18, 2014) ("RFC is asking the Court to make a leap: some of Embrace's loans sustained losses or went into early default, therefore Embrace breached its representations and warranties. This leap is unsupported by the facts pled."). RFC has adequately alleged that, by selling loans with these types of defects, Defendants breached the representations and warranties in the Client Guide.

Finally, RFC has also adequately alleged that these breaches caused the losses RFC has faced and continues to face on account of its liability to trusts and third-party investors. RFC alleges that its RMBS offerings "included a number of RMBS that became the subject of more than a dozen lawsuits brought by investors and other participants in the securitizations, alleging that an abnormally high percentage of the loans contained in the RMBS offerings were defective in one or more ways." (PNC Docket, Am. Compl. ¶ 50.) On this point, Defendants similarly argue that RFC has failed to specifically allege how the loans that each of them sold to RFC caused the loss to the securitization trusts, particularly where the loans from each Defendant may have amounted to a very small percentage of the loans in any given securitization. This

argument is best left for later stages in the proceeding – whether the effect of defects in a very small number of loans in the context of a securitized batch of loans is enough to cause any loss suffered by the security as a matter of law is a fact-specific inquiry.  The Court declines this invitation to convert this causation of damages question to one for summary judgment.  Where RFC has plausibly alleged that the loans that Defendants sold contained defects that violated the representations and warranties and that it was sued on account of securitizations, where high percentages of the loans in the securitizations were defective, it has adequately alleged that defects in Defendants' loans  caused the losses RFC now faces.[11]

### B.      Indemnification

Defendants also argue that RFC has failed to adequately allege a claim for indemnification.  In making this argument, Defendants reiterate arguments they made with regard to the damages element in RFC's breach of contract claim – for example, that RFC fails to plead how defective loans from Defendants caused RFC's losses, which is required by the indemnification clause in the Client Guide.  The Court, as explained above, finds that the sum of RFC's pleadings suffice to allege that Defendants' defective

---

[11] At oral argument, counsel for Defendants informed the Court that they had received voluminous documents the week before the hearing, allegedly listing additional loans. Defendants argued that these filings undermine the adequacy of RFC's pleadings because the loans in the new documents do not match the lists of loans attached in exhibits to the complaint. RFC explained that it submitted the documents to Defendants as part of voluntary discovery and therefore was not improper, nor does it alter the pleadings in the complaint.  The Court does not consider the apparent submission of these documents, which were not provided to it and which it has not reviewed, as either improper or altering its analysis of the adequacy of RFC's pleadings.

loans caused RFC's losses, even when those loans were combined with many others in securitizations and may have accounted for only a small portion of the security. Defendants also argue that RFC's allegations fail to account for the possibility of RFC's wrongdoing and amount to fraud allegations, neither of which would entitle it to indemnification under the Client Guide.  But this argument ignores the standard of review on a motion under Rule 12(b)(6) – the Court accepts RFC's allegations as true.  If Defendants believe there are facts indicating that RFC is not, in fact, entitled to the relief it seeks, they should raise those arguments at later stages in this proceeding.  The Court concludes that RFC has alleged a plausible claim for relief for indemnification.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motions to Dismiss [Civ. No. 13-3468, Docket No. 38; Civ. No. 13-3498, Docket No. 47; Civ. No. 13-3520, Docket No. 30; Civ. No. 13-3526, Docket No. 49] are **DENIED in part** and **GRANTED in part** as follows:.

1.      The motions are **DENIED** with respect to Count II and with respect to Count I for loans sold on or after May 14, 2006.

2.      The motions are **GRANTED** with respect to Count I for loans sold before May 14, 2006.   Count I with respect to the loans sold before May 14, 2006, is **DISMISSED with prejudice**.

DATED:  October 14, 2014                    _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                         JOHN R. TUNHEIM
                                                                    United States District Judge